IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LANCE W. SLAUGHTER, MICHAEL SMITH, ERIKA WILLIAMS, LUCIEN PHILIPPE, KATRINA EVERETT, and KEITH SPELMON, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br> v. <br><br> WELLS FARGO ADVISORS, LLC, <br><br> Defendant. | Case No. 13-cv-06368 <br><br> Judge Harry D. Leinenweber |

**PLAINTIFFS' UNOPPOSED MOTION FOR PROVISIONAL CLASS
CERTIFICATION; PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT;
AND APPROVAL AND DISTRIBUTION OF NOTICE OF SETTLEMENT**

Plaintiffs, by and through their attorneys, Stowell & Friedman, Ltd. ("Plaintiffs' Counsel"), respectfully submit to the Court the parties' proposed class settlement ("Settlement"), which provides meaningful programmatic relief to increase opportunities for African American Financial Advisors ("FAs") and FA Trainees at Wells Fargo Advisors, LLC ("WFA") and a $35.5 million common fund for claims of monetary losses. This Settlement was negotiated at arm's length; is fair, reasonable, and adequate; and satisfies all criteria for preliminary approval under federal law.

**SUMMARY OF SETTLEMENT TERMS**

The proposed Settlement, attached as Exhibit 1, provides comprehensive programmatic relief designed to increase the representation of and opportunities for African American Financial Advisors and FA Trainees, as well as substantial monetary relief for Settlement Class Members.

I. **Programmatic Relief.**

The programmatic relief in the Settlement includes innovative programs designed to address the Plaintiffs' allegations about racial disparities in compensation, attrition, teaming, and business opportunities. Defendant has agreed to revise its policies and practices and to take action designed to enhance opportunities for employment, earnings, and advancement of African American FAs and Trainees. The following programmatic relief will remain in effect for a four-year period following the effective date of the Settlement:

A. **No Mandatory Arbitration/Class Action Waivers.**

Defendant will not impose mandatory arbitration or class action waivers on African American Financial Advisors and FA Trainees for claims of race discrimination and related retaliation.

B. **Elimination of Financial Advisor Training Costs Obligations.**

Defendant will no longer obligate "New Financial Advisors" or FA Trainees for reimbursement of any cost of their training upon separation from the company or program and will end efforts to collect such costs.

C. **Recruiting.**

In an effort to increase the representation of African Americans within its financial advisor workforce, WFA will appoint a person whose primary responsibility will be the recruitment of African American Financial Advisors and FA Trainees. Financial Advisor recruits will also be provided with the opportunity to speak with a current African American FA.

D. **Financial Advisor Coaches.**

WFA will hire two Coaches whose primary responsibility will be to work with African American Financial Advisors and FA Trainees, assisting them in the areas of networking and

building relationships, joining and forming teams, territory assignment, maximizing resources to increase productivity, and business and career development. The Coaches will periodically provide feedback to the Leadership Team established by the Settlement.

    **E.    Focus Groups.**

WFA will establish a Private Client Group ("PCG") Focus Group and a Wealth Brokerage Services ("WBS") Focus Group consisting of African American Financial Advisors and FA Trainees, which shall meet at least semi-annually for the purpose of providing feedback to and dialogue with the Leadership Teams in the areas described in Section F below. Each Focus Group will have no more than 15 members, with a cross-section of length of service, production, and geographic location. The Focus Groups will include at least one class representative who is currently employed as a WFA Financial Advisor.

    **F.    Leadership Teams.**

WFA will create a PCG Leadership Team and a WBS Leadership Team comprising senior business leaders within the respective business channels, including African American leaders. The Leadership Teams will explore ideas and initiatives designed to increase the representation, productivity, retention, and teaming opportunities of African American Financial Advisors and to address the assignment of branch locations for WBS Financial Advisors. The Leadership Teams will receive a presentation by a highly regarded scholar, Professor Frank Dobbin (or other similar scholar/consultant if Professor Dobbin for any reason is not available to serve in such capacity), and will receive input and feedback from the Financial Advisor Focus Groups and Coaches established in this Settlement. The Leadership Teams will meet at least semi-annually and will review data, reports, and analysis regarding financial advisor diversity efforts, progress, and results.

G.   **Consultant.**

The parties jointly selected Professor Frank Dobbin to serve as a scholar/consultant on workplace diversity. Professor Dobbin shall present to the Leadership Teams, and additional audiences designated by the Leadership Team regarding applicable research and successful diversity programs during the Programmatic Relief Period.  In the event that Professor Dobbin is not available to serve as the Consultant, the parties shall jointly select another qualified scholar/consultant for this role.

H.   **Business Development Fund.**

WFA will establish a Business Development Fund that will be available to African American PCG and WBS Financial Advisors to fund business development events or activities, which will be funded at $500,000.00 over the four years of the Settlement.  Eligible Financial Advisors will submit business development proposals to their managers who, working with a Coach, will determine whether the proposal satisfies the criteria established by WFA for use of the Business Development Fund.

I.   **Teaming.**

WFA will encourage diverse teams and will develop and maintain a database or system that stores business profile information for Financial Advisors and FA Trainees who are interested in joining or forming a team.  Participation in the database will be optional for Financial Advisors who are interested in teaming.  The Team Database may also be utilized by the Teams Department within each channel to help facilitate teaming discussions and opportunities.  WFA will inform Financial Advisors that the decision whether to team with particular Financial Advisors may not be made on the basis of the individual's gender, race,

4

national origin, religion, age, sexual orientation, gender identity, disability, marital status, veteran status, or any other legally protected characteristic.

**J.     New Manager Selection.**

Senior Management job opportunities will be posted on WFA's internal job bank for a minimum of five business days, excluding selection decisions made as part of a restructuring, consolidation, or reorganization. WFA will commit to having a diverse pool of candidates for posted Senior Management positions, where possible. WFA will also maintain its Branch Manager Assessment Center program, which assesses participants for non-producing, complex managers. WFA will encourage a diverse pool of applicants for that program and will provide a diverse slate of evaluators.

**K.     Assignment of WBS Financial Advisors to Banking Branches.**

The WBS Leadership Team, with consultation from the WBS Focus Group, will establish a process for WBS Financial Advisors to indicate periodically to which branch(es) they would be interested in moving should a vacancy arise. Before making branch assignments or filling branch vacancies, WBS management will review these branch interest selections and consider as part of the applicant pool for the position, those Financial Advisors who have indicated both an interest in that particular branch and meet the minimum posting criteria established by the company. WBS management will retain the discretion to make branch assignments or fill branch vacancies based on business needs and the best interests of WBS's clients. The Coaches will also have access to the database to assist in business and career development discussions with Financial Advisors. For experienced Financial Advisor recruits and FA Trainees, WBS will provide information on the number of affluent households for the particular branch to which the

Financial Advisor would be assigned, along with appropriate disclaimers that branch assignments may change at the discretion of WBS management and/or in clients' best interests.

      **L.     Monitoring, Reporting, and Meeting with Plaintiffs' Counsel.**

WFA will meet with Plaintiffs' Counsel on an annual basis to demonstrate and confirm WFA's compliance with the Programmatic Relief detailed above. WFA will provide information demonstrating the progress made with regard to the Programmatic Relief and to otherwise discuss equal opportunities for African American Financial Advisors and FA Trainees. WFA will also set forth any new programs and policies that were implemented to increase the representation and success of African American Financial Advisors and FA Trainees and available information regarding the efficacy of those programs.

**II.     Monetary Relief.**

In addition to the comprehensive programmatic relief described above, WFA will establish a Settlement Fund of $35.5 million, plus interest from the date of Preliminary Approval. This Settlement Fund will compensate Settlement Class Members, including the class representatives; provide for all attorneys' fees, costs, and service awards to class representatives awarded by the Court; and provide for all costs of administering the Settlement.

## ARGUMENT

**I.     The Settlement Class Meets All Requirements of Rule 23(a) and Rule 23(b)(2) and Rule 23(b)(3) and Should Be Certified.**

Plaintiffs move to provisionally certify a class of all African Americans who are or were employed as Financial Advisors or licensed FA Trainees by WFA and who worked in the United States in the Private Client Group or in the WFA bank brokerage channel at any time between September 4, 2009, and December 31, 2016.

Before assessing whether the settlement is within the range of reasonableness for purposes of preliminary approval, the Court conducts an independent class certification analysis. The Settlement Class meets all of the requirements for certification under Federal Rule of Civil Procedure 23(a) and Rule 23(b)(2) and (b)(3).

A class may be certified under Rule 23(a) when "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." *Kleen Prods. LLC v. Int'l Paper Co.*, 831 F.3d 919, 923 (7th Cir. 2016) (quoting Fed. R. Civ. P. 23(a)). Here, the proposed Settlement Class potentially includes more than 500 class members who worked for WFA across the United States, making joinder impracticable. "Generally, where class members number at least 40, joinder is considered impracticable and numerosity is satisfied." *Physicians Healthsource, Inc. v. A-S Medication Sols., LLC*, No. 12-CV-05105, 2016 WL 5390952, at *6 (N.D. Ill. Sept. 27, 2016) (quoting *Oplchenski v. Parfums Givenchy, Inc.*, 254 F.R.D. 489, 495 (N.D. Ill. 2008)); *see also Swanson v. Am. Consumer Indus., Inc.,* 415 F.2d 1326, 1333 (7th Cir. 1969) (concluding that 151 class members met numerosity requirement).

Common questions of law and fact are presented about whether Defendant engaged in a pattern or practice of racial discrimination and whether Defendant's teaming, account distribution, territory assignment, and other policies and practices had an unlawful disparate impact against African American Financial Advisors and FA Trainees. *See McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 489 (7th Cir. 2012) ("If the teaming policy causes racial discrimination and is not justified by business necessity, then it violates Title

7

VII as 'disparate impact' employment discrimination—and whether it causes racial discrimination and whether it nonetheless is justified by business necessity are issues common to the entire class and therefore appropriate for class-wide determination.").

The class representatives' claims are typical of Class claims because the representatives, like the Class, are African Americans who are or were Financial Advisors and FA trainees and subject to WFA's account distribution, teaming, assignment, and other policies.

The class representatives will fairly and adequately protect the interests of the class, and they already have devoted significant time to meeting with Plaintiffs' Counsel regarding the claims of the Class and participating in the negotiation of this Settlement. The class representatives also retained experienced counsel who have been regularly appointed by courts as class counsel, including in other discrimination class action lawsuits against other financial services firms. *See, e.g., McReynolds v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, No. 05 C 6583, 2012 WL 5278555, at *1 (N.D. Ill. July 13, 2012) (Gettleman, J.); *Cremin v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 328 F. Supp. 2d 865 (N.D. Ill. 2004) (Castillo, J.); *Martens v. Smith Barney,* No. 96 Civ. 3779, Dkt. 40 (S.D.N.Y. Dec. 10, 1997).

Certification under Rule 23(b)(2) is warranted because the class alleges that Defendant "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." *In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Injury Litig.*, 314 F.R.D. 580, 599 (N.D. Ill. 2016) (quoting Fed. R. Civ. P. 23(b)(2)). Plaintiffs allege that every Class Member was subject to firm-wide account distribution and teaming polices by WFA and that both policies caused a disparate impact on African American Financial Advisors and FA Trainees. The Settlement addresses these allegations and provides programmatic relief designed to increase

employment opportunities for African Americans by, among other things, eliminating financial advisor training cost obligations, enhancing minority recruitment efforts, and creating a Team Database and Financial Advisor Coaches to guide African American Financial Advisors and FA Trainees. The Settlement also would establish Leadership Teams, Focus Groups, and a Business Development Fund to continue to explore ideas and initiatives designed to increase the representation, productivity, retention, and teaming opportunities of African American Financial Advisors and to address the assignment of branch locations for WBS Financial Advisors.

Finally, Plaintiffs' pursuit of monetary relief under 23(b)(3) does not inhibit certification under 23(b)(2). *See Chicago Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chicago*, 797 F.3d 426, 443-45 (7th Cir. 2015) (certifying a class action for both injunctive relief under 23(b)(2) and monetary relief under 23(b)(3) regarding Plaintiffs' contention that a reduction in force by the Chicago Board of Education caused a disparate impact on African American teachers); *McReynolds*, 672 F.3d at 492 (ordering Rule 23(b)(2) certification despite claims for monetary relief). For certification under 23(b)(3), "'questions of law or fact common to class members [must] predominate over any questions affecting individual members'" and a class action must be "superior to other available methods for fairly and efficiently adjudicating the controversy." *Chicago Teachers Union*, 797 F.3d at 443-44 (quoting *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1436 (2013) and Fed. R. Civ. P. 23(b)(3)). Those requirements are met here. *See Kleen*, 831 F. 3d at 926-31 (affirming finding of predominance and superiority where plaintiffs demonstrated a common method of proving aggregate classwide damages).

The parties' settlement is relevant to the Rule 23(b)(3) analysis. *Anchem Prods., Inc. v. Windsor*, 521 U.S. 591, 619-20 (1997). Because Rule 23(b)(3) certification is proposed in the context of a settlement, the "court need not inquire whether the case, if tried, would present

9

intractable management problems, for the proposal is that there be no trial." *Id*. at 620 (citation omitted). Any manageability or predominance concerns relating to individual proceedings and defenses are satisfied by the settlement and its claims resolution process. *See Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 660 (7th Cir. 2004) (lauding the use of special masters to preside over individual damages proceedings as a solution to defendant's manageability concerns).

## II. The Settlement Should Be Preliminarily Approved.

"Federal Rule of Civil Procedure 23(e) requires court approval of any settlement that effects the dismissal of a class action. Before any such a settlement may be approved, the district court must determine that a class action is fair, adequate, and reasonable, and not a product of collusion." *Reynolds v. Beneficial Nat'l Bank,* 288 F.3d 277, 279 (7th Cir. 2002) (citation omitted); *see also In re Nat'l Collegiate Athletic Ass'n,* 314 F.R.D. at 588-89. At the preliminary approval stage, courts review class action settlements to determine whether they are "within the range of possible approval." *Gautreaux v. Pierce*, 690 F.2d 616, 621 n.3 (7th Cir. 1982); *In re Nat'l Collegiate Athletic Ass'n,* 314 F.R.D. at 584, 603. "[T]he court's task is . . . not to conduct a full-fledged inquiry into whether the settlement meets Rule 23(e)'s standards." *Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*, No. 07 C 2898, 2011 WL 3290302, at *6 (N.D. Ill. July 26, 2011) (citing *Armstrong v. Bd. of Sch. Dirs. of City of Milwaukee*, 616 F.2d 305, 314 (7th Cir.1980), *overruled on other grounds, Felzen v. Andreas*, 134 F.3d 873, 875 (7th Cir. 1998)). In determining whether to approve a settlement preliminarily, "the court must consider 'the strength of plaintiffs' case compared to the amount of defendants' settlement offer, an assessment of the likely complexity, length and expense of the litigation, an evaluation of the amount of opposition to settlement among affected parties, the opinion of competent counsel, and the stage of the

proceedings and the amount of discovery completed at the time of settlement.'" *Gehrich v. Chase Bank USA, N.A.*, 316 F. R. D. 215, 227 (N.D. Ill. 2016) (quoting *Synfuel Techs., Inc. v. DHL Express (USA), Inc*., 463 F.3d 646, 653 (7th Cir. 2006)). All of these factors warrant preliminary approval of the proposed settlement.

        **A.    This Settlement Provides Innovative and Meaningful Programmatic Relief And Fair, Substantial Monetary Relief to Class Members.**

The parties agreed upon meaningful programmatic relief, described at pages 2-5, designed to increase the representation of and opportunities for African American Financial Advisors and Trainees. In addition to agreeing to policy changes, WFA has committed its senior leaders to work with African American Financial Advisors and a noted workplace diversity scholar. These changes include, among other things: hiring designated Coaches to assist class members; appointing Leadership Councils of senior management tasked with addressing important employment practices (such as teaming, account distributions, and the assignment of banking branches for bank channel Financial Advisors), engaging a nationally recognized scholar on workplace diversity to address the Leadership Councils, establishing representative Focus Groups of WFA Financial Advisors, making business development funds available to African American Financial Advisors, and designating resources to recruit and hire African American Financial Advisors.

The Settlement Fund of $35.5 million provides substantial monetary relief to the Settlement Class Members allegedly harmed by the policies and practices challenged in this litigation. The Settlement also provides a process to allocate fairly and reasonably the benefits of the settlement among all Settlement Class Members, including the class representatives.

The claims resolution process for distributing the Settlement Fund provides Settlement Class Members the opportunity to submit a claim form explaining their allegations of race

discrimination, financial losses, and any emotional distress they suffered. These claims forms will be reviewed by independent and qualified neutrals. Further, every Class Member who submits a timely claim form will have the opportunity to meet with the Neutral to discuss his or her claim. Finally, in order to make the best informed decisions, the Neutrals will receive background information from Plaintiffs' Counsel regarding WFA's policies and practices and the Class claims.

### B. The Settlement is in the Best Interests of the Class in Light of the Risks of Proceeding through Trial and Appeal.

Absent this Settlement, continued litigation of this action would be complex and lengthy, requiring the investment of considerable resources by both sides and the Court. As the Court is well aware, liability in this case is contested, and both sides would face considerable risks should the litigation proceed. In contrast to the complexity, delay, risk, and expense of continuing litigation, the proposed Settlement will produce prompt, certain, and substantial recovery for Settlement Class Members. In light of the complicated, uncertain, and lengthy litigation facing Settlement Class Members, a settlement that provides the above programmatic and monetary relief is plainly in the best interests of the Settlement Class.

### C. The Settlement is Supported by Competent, Experienced Counsel and is the Product of Arm's Length, Informed Negotiations.

Based on its experience and an in-depth analysis of the merits, record, and risks of this action, Plaintiffs' Counsel enthusiastically recommends this Settlement to the Court for approval. The terms of the proposed Settlement Agreement being presented to the Court were reached only after the assistance of experienced and nationally recognized mediators, Linda Singer of JAMS and Judge David Coar, formerly a federal judge for this Court. The settlement negotiations were protracted and difficult and occurred during multiple mediation sessions and subsequent negotiations over nearly two years. The mediation sessions were attended by class

representatives, senior WFA executives, as well as counsel for the parties. The Settlement is the non-collusive product of extensive litigation and mediation. These factors weigh heavily in favor of approving the Settlement.

III. **The Proposed Payments for Class Representatives' Service Awards and Attorneys' Fees Are Reasonable**.

Plaintiffs' Counsel is proud to have advocated for the Class alongside the class representatives and to petition the Court to award Service Awards to compensate the class representatives for their considerable efforts on behalf of the Class. The $175,000 Service Awards provided for by the Settlement are comparable to similar awards granted by courts in similar cases to class representatives who made substantial investments and sacrifices and achieved outstanding results for the classes of employees they represented. *See, e.g., McReynolds v. Merrill Lynch,* No. 05-C-6583, Dkt. 616 at 5 (N.D. Ill. Dec. 6, 2013) (Gettleman, J.) (16 class representatives awarded service awards of $250,000 each); *Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 694 (N.D. Ga. 2001) (approving $300,000 incentive awards for each class representative in race discrimination case); *Martens v. Smith Barney,* No. 96 Civ. 3779, 1998 WL 1661385, at *4 (S.D.N.Y. July 28, 1998) (class representatives awarded service bonuses up to $150,000 per named plaintiff, $1.9 million in the aggregate in gender discrimination case); *Cremin v. Merrill Lynch*, No. 96 C 3773 (N.D. Ill. 1998) (Castillo, J.) (class representatives awarded service bonuses up to $150,000 per named plaintiff). Plaintiffs' Counsel will file a separate motion in support of the Service Awards.

The Settlement also provides for Plaintiffs' Counsel to petition the Court for reasonable attorneys' fees in an amount no greater than 25% of the Settlement Fund. This 25% of the Settlement Fund is considerably lower than the 33⅓% contingency rate negotiated by the class representatives and set forth in fee agreements entered into as part of this lawsuit. The Seventh

13

Circuit has held that market rate is the best evidence of a reasonable and fair attorney fee. *See Silverman v. Motorola Sols., Inc.*, 739 F.3d 956, 957 (7th Cir. 2013); *Gaskill v. Gordon*, 160 F.3d 361, 363 (7th Cir. 1998). A fee of 25% of the Settlement Fund is reasonable and well within the range of attorneys' fee awards in cases involving comparable risks and litigation costs. *Silverman*, 739 F.3d at 958 (affirming 27.5% fee award of $200 million settlement fund); *Gaskill*, 160 F.3d at 362–63 (approving 38% fee in securities class settlement); *Mansfield v. Airline Pilots Ass'n Int'l*, No. 06 CV 6869, Dkt. 373 ¶¶ 17-18 (N.D. Ill. Dec. 14, 2009) (awarding 35% of $44 million settlement fund for class of senior pilots alleging union discriminated in favor of junior pilots); *Smith v. Nike Retail Servs., Inc.*, No. 03 cv 9110, Dkt. 184 at 9 n.2, 187 ¶ 10 (N.D. Ill. Oct. 1 & 2, 2007) (awarding 32.37% of $7.6 million settlement fund in race discrimination class action). Plaintiffs' Counsel will submit a separate fee petition with the Motion for Final Approval, along with a request for reimbursement of litigation costs advanced on behalf of the Class.

**IV.    The Proposed Class Notices Are Appropriate.**

A settlement must provide adequate notice to Settlement Class Members so that each Settlement Class Member can make an informed choice about whether to opt out, object, and/or file a timely claim and have an opportunity to receive a monetary award. The Proposed Class Notices, to confirmed and potential class members respectively, are clear, accurate, and satisfy due process. The Notices provide a detailed summary of the terms of the Settlement, including the proposed claims resolution process for monetary awards. They also inform Settlement Class Members how and when to file objections and describe the procedures for opting out and submitting a claim.

## CONCLUSION

For all the foregoing reasons, the parties respectfully request that the Court issue an order: (1) certifying the Settlement Class; (2) preliminarily approving the proposed class action settlement; (3) appointing Class Counsel and the Class Representatives; (4) approving and directing distribution to the class of notices of settlement; and (5) setting a schedule for the final approval process. Exhibit 2 is the order proposed by the Parties.

Dated: December 30, 2016

                                                          Respectfully submitted,
                                                          **STOWELL & FRIEDMAN, LTD.**

                                                          By:   /s/ *Linda D. Friedman*
                                                                    Linda D. Friedman

Linda D. Friedman
Suzanne E. Bish
George S. Robot
303 W. Madison, 26th floor
Chicago, Illinois 60606
(312) 431-0888 (tel)
(312) 431-0228 (fax)

## CERTIFICATE OF SERVICE

  I, Suzanne E. Bish, at attorney, hereby certify that on December 30, 2016, I filed the foregoing *Motion for Preliminary Approval of Settlement* via the Court's CM/ECF system, which caused a copy of the same to be served upon all counsel of record via ECF.

              s/ Suzanne E. Bish